**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**STEVENSON BRICK AND BLOCK COMPANY, General Wholesale Building Supply Company, New Bern Building Supply Company and Ready-Mix Concrete Corp., Respondent.**

No. 11362.

United States Court of Appeals
Fourth Circuit.

Argued Dec. 6, 1967.

Decided March 29, 1968.

Arthur A. Horowitz, Atty., N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Lawrence M. Joseph, Atty., N. L. R. B., on brief), for petitioner.

J. W. Alexander, Jr., Charlotte, N. C. (Blakeney, Alexander & Machen, Charlotte, N. C., and Barden, Stith, McCotter & Suggs, New Bern, N. C., on brief), for respondent.

Before SOBELOFF, BOREMAN and WINTER, Circuit Judges.

SOBELOFF, Circuit Judge:

The controlling question here is whether substantial evidence supports the Labor Board's finding that the em-

ployer [1] has refused to bargain in good faith in violation of section 8(a) (5), 29 U.S.C. § 158(a) (5). If, as the Board found, the employer was guilty of this unfair labor practice, and if the strike that occurred while the parties were engaged in collective bargaining was caused by this conduct of the employer, it was an unfair labor practice strike and the strikers, upon request, should have been reinstated. NLRB v. Southland Cork Co., 342 F.2d 702 (4th Cir. 1965). On the other hand, if the court finds the evidence insufficient to support the Board's finding, the strike must be deemed an economic one, entitling the strikers to reinstatement only if their jobs had not been filled by permanent replacements hired during the strike. NLRB v. Mackay Radio & Telegraph Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938).

On November 20, 1964, in an election preceded by threats, coercive interrogation, a discriminatory credit policy and a unilateral reduction of working hours. the union [2] was selected as the exclusive bargaining agent of an appropriate unit of employees. Collective bargaining was initiated by the union's submission of a proposed contract early in January, 1965. Fourteen meetings were held by the parties over a six-month period. On February 16, the employer offered its counterproposals. After about four months of bargaining without reaching final agreement, forty-three of the unit's seventy-five employees went on strike. Ten days later the workers terminated the strike and unconditionally offered to return to their jobs. They were told that no work was available and were refused reinstatement.

Shortly after the final bargaining session, a Labor Board complaint was issued upon charges filed by the union, accusing the employer of unfair labor practices in refusing (a) to bargain in good faith and (b) to reinstate the strikers. The Board, adopting in its entirety the Trial Examiner's findings, reasoning, conclusions and proposed order, agreed that the strike was an unfair labor practice strike. It accordingly directed that the strikers be reinstated to their former or substantially similar positions. In the same proceeding, the Board approved the Examiner's findings that the employer had violated section 8(a) (1), (3) and (5), 29 U.S.C. § 158(a) (1), (3) and (5), by its pre-election conduct at least seven months prior to the strike.[3] We enforce the Board's order predicated upon findings of pre-election unfair labor practices, since they find support in the record as a whole, Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), but cannot accord similar treatment to the unsupported reinstatement order.

In concluding that the employer had not bargained in good faith, the Trial Examiner found that while the employer conceded on a number of minor issues, its

"adamant opposition to any concession with respect to seniority, the checkoff, a Christmas bonus or a wage adjustment, made impossible the finalization of any complete agreement. Earlier herein, it was found that the bar-

---

1. The order was issued against Stevenson Brick and Block Co., General Wholesale Building Supply Co., New Bern Building Co., and Ready-Mix Concrete Corp. (hereinafter collectively referred to as the respondent-employer), a single, integrated enterprise engaged in the manufacture and sale of brick, concrete and general building supplies in and around New Bern, North Carolina.

2. The Retail, Wholesale and Department Store Union.

3. The employer focused its attack almost exclusively on the refusal to bargain charge, offering very little evidence to refute the charge of earlier unfair labor practices. The initial complaint charging the employer with violating section 8(a) (1), (3) and (5) was filed on December 9, 1964, and was amended on January 27, 1965. There had been no hearing and the parties had tentatively reached a settlement when the refusal to bargain charge was filed on May 4, 1965, amended July 13, 1965. The old and the new charges were then consolidated and heard by the Trial Examiner on September 28, 29 and 30, 1965.

237

gaining sessions were preceded by extensive violations of Section 8(a) (1), (3) and (5) of the Act from September to December 1964 on the part of the Respondent's supervisory hierarchy. It is the conclusion of the Trial Examiner that, in the light of this background, the Respondent's position on the foregoing subjects at the bargaining sessions held during the winter and spring of 1965 was motivated by a desire to defeat, rather than promote, an agreement."

While the Board, failing to exercise its independent reviewing power, was content to accept this conclusion of the Trial Examiner, we are unable to do so because it was derived in part from a palpable misinterpretation of certain testimony and a disregard of other evidence directly bearing thereon.

The duty to bargain, as embodied in section 8(d) of the Act, requires both parties to "meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or [negotiate] an agreement or any question arising thereunder, and [execute] a written contract incorporating any agreement reached if requested by either party * * *." While the section specifically provides that this "obligation does not compel either party to agree to a proposal or require the making of a concession," the courts have insisted that the negotiations be entered "with an open mind and purpose to reach an agreement consistent with the respective rights of the parties." Majure v. NLRB, 198 F.2d 735, 739 (5th Cir. 1952); NLRB v. American National Insurance Co., 343 U.S. 395, 72 S.Ct. 824, 96 L.Ed. 1027 (1952); Radiator Specialty Co. v. NLRB, 336 F.2d 495 (4th Cir. 1964). Whether the particular negotiations were in fact conducted in "good faith" involves subjective factors which must be considered in the factual context of the particular case. Solo Cup Co. v. NLRB, 332 F.2d 447, 448 (4th Cir. 1964).

The finding of bad faith on the part of the employer in the instant case was based in part on the Trial Examiner's view that as the union was obligated to protect the interests of all of its members, a majority of whom were Negroes, it therefore "could not [have been] expected to acquiesce in the pay scale and bonus arrangement which, on the surface at least, appeared to place the Negro employees in a less favorable position than the white employees of the unit." From this the Examiner reasoned that the employer purposefully refused to make any concessions on either the wage or bonus issues knowing full well that without such concessions no agreement could ever be reached. Without getting into the question of whether in fact the wage and bonus structures were discriminatory, the record furnishes no foundation for this line of reasoning. The union, for its part, failed to offer a single proposal aimed at rectifying the alleged inequity, but merely requested a 35 cent across-the-board wage increase and the continuation of the employer's "policy of giving all employees a Christmas bonus." These requests, if granted, would only have continued any disparity that may have existed.

Further evidence of the employer's lack of good faith was, according to the Examiner, demonstrated by its refusal to concede on any important issue. For example, the Examiner states, "[w]hen the Respondent finally made a bonus offer and thereafter, as its counsel stated, the Union 'made an issue about it,' the Employer's response was the complete withdrawal of the offer." The Examiner's statement is a distortion of the record. It is based on the selection of a portion of the answer of the employer's negotiator to a question on cross-examination concerning the bonus issue and completely disregards the rest of the answer. The part of the answer relied upon by the Examiner in respect to the bonus was, "if it's a serious stumbling block, let's withdraw it." If this language stood alone it might possibly, though not nec-

essarily, bear the sinister meaning attached to it by the Examiner. The entire answer, however, was as follows: "I said, well, I thought that Mr. Parker [the union's assistant negotiator] had agreed to it [the bonus] ; I said, if it's a serious stumbling block, let's withdraw it, *and start all over again on it, and see if we can reach something * * *.*" (Italics supplied.) It is uncontroverted that the employer's representative then requested that the union submit a counter-proposal, and to this request the union never responded. Plainly, then, the testimony upon which the Trial Examiner relied does not, when read in its entirety, support his conclusion.

■ The employer's rejection of every union request for an increase in wages, and its refusal to offer "even a penny" was pointed to as further evidence of its bad faith. The Examiner's report states:

"Throughout the entire series of bargaining conferences the Respondent took the unyielding position that there would be no change in its wage structure. Initially, the Union sought a 35 cent wage increase. After the strike began on May 3, Parker amended this offer with the suggestion that the Respondent start paying a minimum of $1.25 an hour, the equivalent of a 10 cent increase for most of the employees. Finally, late in June, Parker asked whether there was a prospect of any raise, even a penny. To all of these requests, the Respondent's answer was an emphatic negative."

This finding totally disregards the numerous admissions by the union's assistant negotiator, Parker, that the union had not made a single alternate proposal after its initial 35 cent demand. As to the penny, Parker testified that at the last session, after the May 3 strike, he inquired "was there any raise whatsoever in the cards, whatsoever, as much as a penny." To this seemingly facetious remark the employer responded, "would you take a penny?" and the matter was dropped. Where two opposing negotiators steadfastly refuse to budge from their respective positions, it can hardly be inferred from this alone that either acted in bad faith.

■ There is, on the other hand, substantial evidence, overlooked by the Trial Examiner, suggesting that want of good faith might no less readily be ascribed to the union. Lebold, the union's chief negotiator, failed to attend half of the fourteen bargaining sessions. After missing the sessions conducted during the month of March, he reappeared at the April 23 session and immediately withdrew the union's consent to a number of points that had been tentatively agreed upon during that period, including one on the Christmas bonus. See NLRB v. Shannon, 208 F.2d 545, 548 (9th Cir. 1953). In arguing the employer's bad faith, the Examiner's report relied heavily upon the employer's failure to make any concessions; yet he gave no discernible weight to the uncontradicted testimony that after the employer tendered its proposed contract the union failed to submit a single counterproposal prior to the May 3 strike, despite specific requests that it do so. Surely the conduct of the union cannot be completely ignored when assessing the good or bad faith of the employer at the bargaining sessions. We perceive here no one-sided obduracy wilfully clogging agreement; responsibility for the failure appears to be attributable about equally to the two contenders.

■ The Trial Examiner further predicated his decision upon the employer's unfair labor practices committed more than seven months before the bargaining sessions began. Such remote conduct has little probative value in determining the employer's bargaining intentions. This misconduct cannot, therefore, support the charge of refusing to bargain in violation of section 8(a) (5) without some showing of bad faith at the negotiations themselves. As indicated above, no such showing has been made.

■ Since there is insufficient evidence to support the Board's finding that

the employer failed to bargain in good faith, we conclude that the May 3 walkout was an economic strike. As economic strikers, employees are entitled to reinstatement unless permanent replacements have been hired during the strike. If vacancies remain, they must be filled from the ranks of the strikers without anti-union discrimination. NLRB v. Mackay Radio & Telegraph Co., supra. In the absence of any evidence or even a claim that the jobs sought by these strikers were still open at the time they requested reinstatement, see NLRB v. Fleetwood Trailer Co., 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614 (1968), that portion of the Board's order requiring reinstatement will not be enforced.

Enforcement granted in part and denied in part.