**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 06-1537**

---

LB&B ASSOCIATES, INCORPORATED; OLGOONIK
LOGISTICS, LLC, d/b/a North Fork Services
Joint Venture, a joint venture,

Petitioners,

versus

NATIONAL LABOR RELATIONS BOARD,

Respondent,

INTERNATIONAL UNION OF OPERATING ENGINEERS,
Local 30,

Intervenor - Respondent.

---

**No. 06-1583**

---

INTERNATIONAL UNION OF OPERATING ENGINEERS,
Local 30,

Intervenor - Petitioner,

versus

LB&B ASSOCIATES, INCORPORATED; OLGOONIK
LOGISTICS, LLC, d/b/a North Fork Services
Joint Venture, a joint venture,

Parties in Interest,

and

NATIONAL LABOR RELATIONS BOARD,

Respondent.

_____

**No. 06-1673**
_____

NATIONAL LABOR RELATIONS BOARD,

Petitioner,

versus

LB&B ASSOCIATES, INCORPORATED; OLGOONIK
LOGISTICS, LLC, d/b/a North Fork Services
Joint Venture, a joint venture,

Respondents.

_____

On Petitions for Review and Cross-application for Enforcement of an
Order of the National Labor Relations Board. (29-CA-25511; 29-CA-
25668; 29-CA-25762; 29-CA-25777; 29-CA-25779)

_____

Argued: March 13, 2007                    Decided: May 11, 2007
_____

Before WILLIAMS and MOTZ, Circuit Judges, and HAMILTON, Senior
Circuit Judge.

_____

Petitions for review denied and cross-application for enforcement
granted by unpublished per curiam opinion.

_____

**ARGUED:** Jennifer McDougal Miller, WYRICK, ROBBINS, YATES & PONTON,
Raleigh, North Carolina, for LB&B Associates, Incorporated. Philip
Adam Hostak, NATIONAL LABOR RELATIONS BOARD, Office of the General
Counsel, Washington, D.C., for the Board. Marty G. Glennon, MEYER,
SUOZZI, ENGLISH & KLEIN, P.C., Melville, New York, for the
International Union of Operating Engineers, Local 30. **ON BRIEF:**
Benjamin N. Thompson, J. Kellam Warren, WYRICK, ROBBINS, YATES &
PONTON, Raleigh, North Carolina, for LB&B Associates, Incorporated.

2

Ronald Meisburg, General Counsel, John E. Higgins, Jr., Deputy General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Julie Broido, Supervisory Attorney, NATIONAL LABOR RELATIONS BOARD, Office of the General Counsel, Washington, D.C., for the Board.

———————————————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

LB&B Associates, Inc. and Olgoonik Logistics, LLC, doing business as North Fork Services Joint Venture ("the Company") petition for review of the Decision and Order of the National Labor Relations Board finding that the Company violated the National Labor Relations Act ("the Act") by discharging an employee for engaging in protected union activity and by failing to reinstate eight employees who had engaged in a strike. Local 30 of the International Union of Operating Engineers ("the Union") cross-petitions for review of the Board's conclusion that the Company did not violate the Act by failing to reinstate two former employees to particular prestrike position. We deny the petitions for review and grant the Board's application for enforcement of its Order.

I.

The Department of Homeland Security ("DHS") operates the Plum Island Animal Disease Center ("the Center"), located off Long Island, New York, to study exotic animal diseases. The Company runs the physical plant facilities and systems, and operates ferries to and from the Center. The Union represents the Company's non-supervisory maintenance, operations, and support employees. Following the expiration of a collective-bargaining agreement, the Center's union-represented employees went on strike on August 14,

4

2002. The strike ended on March 21, 2003, with the Union's unconditional offer to return to work.

During the strike, in November 2002, the Company hired James McKoy (unaware that he was a union member) to replace a striking air-conditioning technician. McKoy and a co-worker worked primarily in the chiller plant; at times of their choosing they left the chiller plant to use the lavatory, take breaks, and eat lunch, etc. McKoy had a perfect disciplinary record and the Company rated his work as very good.

Six weeks after the strike ended, on June 19, 2003, McKoy distributed union leaflets during his lunch break and posted leaflets on the break-room bulletin board. McKoy offered a leaflet to his supervisor, Ronald Primeaux, who instructed McKoy not to distribute the leaflets and prepared a counseling document regarding the incident. McKoy also left leaflets in employee mailboxes and continued to hand out the leaflets in the employee cafeteria. That same afternoon, McKoy attended a community meeting featuring Mark Hollander, a DHS official and the Center's director, and Rise Cooper, an aide to Senator Hillary Clinton; at the meeting McKoy identified himself as a union member and raised workplace health, safety, and security concerns.

After lunch Primeaux spoke with his superior, Matthew Raynes, who instructed him to discipline McKoy. Primeaux found McCoy as he was leaving the community meeting and brought him to Raynes's

5

office.   McCoy identified himself as a union member and acknowledged attending the community meeting.  Raynes told McKoy that he intended to discharge him for being away from his work area without permission.  Hollander then arrived and told Raynes he could not fire McKoy for talking with him, and instructed McKoy to return to work the following morning.

The next morning, an armed security guard met McKoy at the ferry landing, searched him, and brought him to Raynes's office, where Primeaux handed him a termination later, dated that day, stating that he was being discharged for leaving his work area without his supervisor's permission.  When hired, McKoy had signed a document describing the Company's disciplinary policy, which provided that posting and distributing notices and leaflets, and failure to be at the designated work area after breaks or meals, were infractions that "do not warrant immediate discharge;" but that incidents involving drugs, fighting, fraud, sabotage, and "leaving the job or work area during work hours without proper supervisory approval" could lead to immediate discharge.

In addition to firing McKoy, the Company also failed, after the strike, to reinstate nine former strikers: Charles Bumble, Arthur Siemerling, Arthur Kerr, Bernard Patenaude, Albert Letavec, Virginia Soullas, Martin Weinmiller, Robert Borrusso, and Francis Occhiogrosso.

6

The Board subsequently filed a complaint and notice of hearing against the Company, alleging that the Company violated the Act by discharging McKoy because of his protected activities and by not reinstating the nine former strikers after they offered to return to work.

After a six-day hearing, an Administrative Law Judge ("ALJ") found that McKoy and a non-union co-worker whose testimony supported McKoy, Joseph Franco, offered credible and reliable testimony. In contrast, the ALJ did not find Hollander (whom the ALJ considered "not an accurate witness"), Raynes, and Primeaux to be credible and reliable because of "inconsisten[cies]", "serious discrepanc[ies]," and "inaccura[cies]" in their testimony. Based on these credibility determinations, the ALJ found that the Company "seized upon a pretext to discharge McKoy," and "would not have discharged McKoy but for the fact that he engaged in union activities," and so violated the Act. The Board affirmed the ALJ's conclusion as to McKoy.

The ALJ also made the following factual findings with respect to the former strikers:

1. The Company failed to reinstate Charles Bumble, an ordinary seaman since 2001, to that same position after he saw a help-wanted advertisement for the job; instead, the Company filled the position with an outside hire.

7

2. The Company failed to reinstate Arthur Siemerling, a former able-bodied seaman, as an ordinary seaman, even though the positions had the same duties and similar pay and several outside applicants were hired for these positions.

3. After Arthur Kerr accepted the Company's offer to return as an ordinary seaman, and said he would return in two weeks in order for him to give notice to his interim employer, the Company told him it would not rehire him.

4. The Company would not reinstate Bernard Patenaude as a part-time able-bodied seaman or master, but only offered him a full-time position that required him to start work each morning on the opposite side of Long Island Sound from his residence.

5. Although the Company had previously employed Albert Letavec as a master seaman, after the strike it only offered to rehire him as an ordinary seaman and hired an outsider for the master seaman position.

6. The Company failed to rehire Virginia Soullas as a chef, replacing her by promoting an outsider hired during the strike.

7. The Company filled Martin Weinmiller's former position as an operator in the wastewater treatment plan with an outside hire.

8. The Company also failed to rehire Robert Borrusso as a wastewater treatment operator, and instead hired an outsider for a position as "decontamination operator" with duties virtually identical to Borrusso's.

8

9. The Company did not offer Francis Occhiogrosso, a trades helper/laborer when the strike began, a newly created laborer/escort position.

The ALJ found that the Company violated the Act by failing to reinstate Bumble, Siemerling, Kerr, Patenaude, Letavec, Soullas, Weinmiller, and Borrusso; the Board affirmed. The ALJ also found that the Company violated the Act by not recalling Arthur Kerr to the position of master seaman, because Kerr had done the work of a master at times prior to the strike. The Board reversed, holding that the Company was required to reinstate Kerr as an ordinary seaman, but not as a full-time master. The ALJ also found that the Company violated the Act by failing to offer a job to Francis Occhiogrosso as a laborer/escort. The Board reversed, holding that the newly created laborer/escort position was not substantially equivalent to Occhiogrosso's prestrike position as a trades helper/laborer.

The Company petitions for review of the Board's finding that the Company violated Sections 8(a)(1) and (3) of the Act by firing McKoy and by failing to reinstate the eight former employees. The Union petitions for review of the Board's decision with respect to Kerr and Occhiogrosso.

9

Section 8(a)(1) of the National Labor Relations Act protects the rights of workers to organize into unions by making it illegal for employers "to interfere with, restrain or coerce employees in exercise of" their union rights. 29 U.S.C. § 158(a)(1). As relevant to McKoy's case, employees have a right to distribute union literature in non-working areas during non-working times, Beth Israel Hosp. v. NLRB, 437 U.S. 483, 491-93 (1978), and to express concerns about the safety and well-being of employees on the job, Martin Marietta Corp. v. NLRB, 898 F.2d 146 (4th Cir. 1990). Section 8(a)(3) of the Act makes it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). An employer violates Sections 8(a)(1) and (3) by discharging an employee for engaging in protected union activities. See, e.g., FPC Holdings, Inc. v. NLRB, 64 F.3d 935, 942-43 (4th Cir. 1995).

We defer to the Board's interpretations of the Act as long as they are "rational and consistent with the Act." Sam's Club v. NLRB, 173 F.3d 233, 239 (4th Cir. 1999) (internal quotation marks omitted). We uphold the Board's factual findings if "supported by substantial evidence on the record considered as a whole," -- that is, "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  Id. (internal quotation marks omitted).  Finally, we accept an "ALJ's credibility determinations . . . absent exceptional circumstances."  Id. at 240.


A.

To determine whether the Board properly found that the Company violated the Act by firing McKoy for engaging in protected union activity, we apply the burden shifting test set forth in Wright Line, 251 NLRB 1083 (1980), enforced, 662 F.2d 889 (1st Cir. 1981). Under the Wright Line test, if substantial evidence supports the Board's prima facie finding that an employee's protected activity was a motivating factor in his termination, then the burden shifts to the Company to prove that it would have taken the same action absent any protected conduct.  If the Board believes the Company's stated reason for the termination is pretextual, then the employer's defense fails.  USF Red Star, Inc. v. NLRB, 230 F.3d 102, 106 (4th Cir. 2000) (citing Wright Line, 662 F.2d at 906).

In this case, the Board concluded that McKoy's protected activity was a motivating factor in his termination: the Board found that McKoy engaged in protected activity, that the Company knew of the activity, and that "the timing of [McKoy's] discharge, which immediately followed" the Company's learning of "his union sympathies, supports an inference of animus."

11

The Company disputes the Board's finding that it knew McKoy engaged in protected activity at the community meeting. Substantial record evidence, however, belies the Company's claim that it was unaware -- when it fired McKoy -- that McKoy's meeting with Hollander and Cooper concerned workplace health and safety concerns and so was of a protected nature. Furthermore, the Company does not maintain that it did not know of McKoy's union membership when he engaged in leafleting activities. This knowledge alone, which came less than 24 hours before McKoy's discharge, supports an inference that the Company fired McKoy for his union activity. In sum, substantial evidence supports the Board's finding of a prima facie case of termination based on anti-union animus.

With the burden shifted under Wright Line, the Company next argues that it would have discharged McKoy even if he had not engaged in protected activities because he left his post for non-work related matters without his supervisor's permission, an offense that warrants immediate discharge under Company policy. However, the record evidence supports the Board's finding that McKoy regularly left the chiller plant without permission to perform air conditioning maintenance, check his mailbox, obtain equipment, and eat lunch. Thus, substantial evidence supports the Board's conclusion that the Company did not enforce its policy

12

against leaving a work area without permission until it learned of McKoy's protected union activity.

The Company's treatment of similarly situated employees provides further evidence that the Company's stated reason for firing McKoy was pretextual. Cf. Sam's Club, 173 F.3d at 244. Here, the Board compared McKoy's fate to that of Alwin McElroy and Joseph Franco, two comparators who were similarly situated to McKoy. McElroy, a boiler operator who worked in McKoy's department, had twice falsified his timesheets -- an offense that also warrants immediate discharge under the Company's disciplinary policy. After McElroy's first offense, the Company merely counseled him, and after his second, the Company conducted a thorough investigation before discharging him a week later. Moreover, McKoy's co-worker in the chiller plant, Franco, was absent from the plant for at least 45 minutes on June 19th -- the day McKoy attended the community meeting -- but the Company did not so much as investigate this absence, let alone discipline Franco for it. Supervisor Primeaux even testified that although Franco could have been immediately discharged under Company disciplinary policy, Primeaux did not discipline Franco at all because Primeaux was not "concerned" about Franco.

Based on this evidence, the Board found that the Company's "treatment of McKoy . . . stands in stark contrast to its treatment of other employees investigated and disciplined for violations of

13

work rules," and that the Company "presented no evidence that it discharged or disciplined other employees for being absent from their work area for similar periods of time." Substantial evidence supports the Board's finding that these two comparators were similarly situated to McKoy, and that the Company's stated reason for terminating McKoy was pretextual.

Accordingly, we deny the Company's petition for review with respect to McKoy.

B.

The Company also challenges the Board's finding that the Company violated Sections 8(a)(1) and (3) of the Act by failing to reinstate eight former strikers to their vacant former positions or substantial equivalents. The Act provides that barring legitimate and substantial business justifications, upon their unconditional offer to return to work, strikers are entitled to reinstatement to their former jobs (or substantially equivalent jobs) if vacancies exist. NLRB v. Fleetwood Trailer Co., 389 U.S. 375, 378 (1967). The employer carries the burden of justifying the failure to reinstate, for example by showing that the jobs are occupied by workers hired as permanent replacements during the strike or that there is no need to fill the positions. Id. at 378.

Review of the record reveals that substantial evidence supports the Board conclusions that: (1) Charles Bumble did not

14

resign during the strike, and the Company lacked a substantial or legitimate reason for failing to reinstate him to his prestrike position; (2) Arthur Siemerling, formerly an able-bodied seaman, should have been reinstated as an ordinary seaman, because those positions are substantially equivalent; (3) Arthur Kerr complied with Company requirements regarding reinstatement and was entitled to be reinstated as an ordinary seaman; (4) the Company should have reinstated Bernard Patenaude as a master seaman and allowed him to start his workday in Connecticut; (5) the Company should have reinstated Albert Letavec as a master, because the master position was substantially equivalent to Letavec's prestrike work; and (6) the Company has not shown any "substantial and legitimate" business reason for failing to reinstate Virginia Soullas to the vacant chef position. Accordingly, we also deny the Company's petition for review with respect to these workers.

As to Martin Weinmiller and Robert Borrusso, the Company asserts that it need not have reinstated them as wastewater treatment plant (WWTP) and decontamination operators because they were not qualified for the vacant positions. The Company contends that even though Weinmiller and Borrusso worked as WWTP operators before the strike, they lack the required New York State certifications for this position. The Board affirmed the ALJ's finding that the state regulations -- now, as before the strike -- require only that one person with appropriate certification be at

15

the plant for two hours each day, and the Company has offered no evidence that any regulatory requirements have changed since the strike and does not suggest it was not in compliance before the strike. We therefore deny the Company's petition for review with respect to Weinmiller and Borrusso. We note, however, that the Board's reinstatement order provides the Company the opportunity to establish during compliance proceedings that New York State regulations prohibit the employment of Weinmiller and Borrusso as WWTP operators.

C.

The Union cross petitions for review of the Board's finding that the Company did not violate the Act by failing to hire Arthur Kerr as a full-time master and Francis Occhiogrosso as a laborer/escort. We deny the Union's petition with respect to both employees.

Although the Company violated the Act by failing to reinstate Kerr to the position of ordinary seaman, we agree with the Board that the Company was not required to reinstate Kerr as a full-time master. The Board concluded that "Kerr's occasional [prestrike] part-time work as a master does not establish that he held the position of full-time master, and his prestrike position [as an ordinary seaman] was not substantially equivalent to the full-time master position available after the strike." The Union argues that

16

Kerr functioned as a fill-in master one to two times per month when another master was sick, and that he had the required licenses and qualifications for the master position. However, substantial evidence supports the Board's conclusion that the positions of ordinary seaman and master are not substantially equivalent. Therefore, the Company had no duty to reinstate Kerr to the master position.*

We also agree with the Board that the Company had no duty to hire Francis Occhiogrosso for a vacant laborer/escort position. Prior to the strike, Occhiogrosso worked as a trades laborer/helper, and his duties included hauling cargo off boats, handling animals, performing building repairs, and landscaping. In response to new DHS regulations, the Center created a new laborer/escort position, with duties including escorting visitors and workers to secured areas. Because the Center is a secured facility, the escort/laborer position required a limited background investigation clearance. When a lab employee who had this clearance turned down the vacant laborer/escort position, the Company advertised the job as purely a security escort position, with no laborer duties. For these reasons, we conclude that substantial evidence supports the Board's holding that the vacant

---

*This result does not contradict that reached with respect to Bernard Patenaude. Unlike Kerr, Patenaude had a prestrike position that was substantially equivalent to that of a master seaman: (1) he had worked for a period entirely as a master; and (2) he worked the majority of his time immediately before the strike as a master.

17

escort position was not substantially equivalent to Occhiogrosso's prestrike laborer position.

## III.

For the foregoing reasons, we deny the petitions for review and grant the Board's application for enforcement of its order.

<u>PETITIONS FOR REVIEW DENIED AND
CROSS-APPLICATION FOR ENFORCEMENT GRANTED</u>